**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 23-6914

UNITED STATES OF AMERICA,

Petitioner - Appellee,

v.

ROBERT BOYD,

Respondent - Appellant.

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh.  James C. Dever III, District Judge.  (5:08-hc-02061-D)

Argued:  January 28, 2026                                         Decided:  August 6, 2026

Before DIAZ, Chief Judge, and THACKER and BERNER, Circuit Judges.

Affirmed by published opinion. Judge Berner wrote the opinion, in which Chief Judge Diaz and Judge Thacker joined.

**ARGUED:**  Jaclyn L. Tarlton, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellant.  Genna Danelle Petre, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.  **ON BRIEF:**  G. Alan DuBois, Federal Public Defender, Jennifer C. Leisten, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellant.  Michael F. Easley, Jr., United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

BERNER, Circuit Judge:

Congress enacted the Adam Walsh Child Protection and Safety Act of 2006 to prevent child abuse and to protect children from sexual exploitation and violent crime. The Act established a procedure for the civil commitment of an individual who has been designated by a federal district court as a "sexually dangerous person." With this designation come significant consequences. Once designated a "sexually dangerous person," an individual is committed to the custody of the United States Attorney General. Robert Boyd was one such individual.

While on probation following his conviction for several criminal sexual offenses against minors, Boyd was convicted of downloading child sexual abuse material. Shortly before Boyd completed his prison sentence, the Government initiated post-incarceration civil commitment proceedings against him in federal district court. The district court deemed Boyd a "sexually dangerous person" and ordered him civilly committed pursuant to the Adam Walsh Act. Approximately eight years later, the district court ordered Boyd conditionally discharged finding that he no longer posed a threat of harm if released subject to a prescribed regimen of treatment. Boyd's prescribed treatment regimen included a number of conditions. Boyd was required to submit to supervision by the United States Probation Office, to participate in and comply with a treatment program, and to avoid direct contact with minors. Boyd was also prohibited from possessing adult pornography and child sexual abuse material.

Approximately one year later, the Government sought to revoke Boyd's discharge on the ground that Boyd had failed to comply with his prescribed treatment regimen. The

2

district court agreed with the Government and determined that Boyd would pose a threat of harm to others if he were to remain in the community. Accordingly, the district court revoked Boyd's conditional discharge and returned him to the custody of the Attorney General.

On appeal, we affirm the determination of the district court.

## I.    Background

### A.    Adam Walsh Child Protection and Safety Act

The Adam Walsh Child Protection and Safety Act established a judicial procedure for the civil commitment of an individual who has been certified by the United States Attorney General or the Director of the Bureau of Prisons to be a "sexually dangerous person."[1] *See* 18 U.S.C. § 4248(a). The Act defines a "sexually dangerous person" as "a person who has engaged or attempted to engage in sexually violent conduct or child molestation and who is *sexually dangerous to others*." *Id.* § 4247(a)(5) (emphasis added). A person is considered to be "sexually dangerous to others," pursuant to the Act, if he "suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released." *Id.* § 4247(a)(6).

---

[1] This court has described the purpose and procedures of the Adam Walsh Act in a number of prior cases. *See, e.g.*, *United States v. Vandivere*, 88 F.4th 481, 488–89 (4th Cir. 2023); *United States v. Charboneau*, 914 F.3d 906, 908–09 (4th Cir. 2019); *United States v. Comstock*, 627 F.3d 513, 515–16 (4th Cir. 2010).

3

To initiate a civil commitment proceeding, the United States Attorney General or the Director of the Bureau of Prisons certifies to a federal district court that an individual is a "sexually dangerous person." *Id.* § 4248(a). Upon receipt of such certification, the federal district court must hold an evidentiary hearing. *Id.* §§ 4248(a), (c); *see id.* § 4247(d). To establish that an individual is a "sexually dangerous person," the government must prove by clear and convincing evidence that the individual: 1) "had engaged or attempted to engage in sexually violent conduct"; 2) "suffered from a serious mental illness, abnormality, or disorder"; and 3) "as a result, would have serious difficulty refraining from sexually violent conduct if released." *United States v. Francis*, 686 F.3d 265, 272 (4th Cir. 2012). If the court concludes that the government met its burden on all three elements, the court must deem the individual a "sexually dangerous person" and order him committed to the custody of the Attorney General. 18 U.S.C. § 4248(d).

The Attorney General may civilly commit an individual deemed by a court as a "sexually dangerous person" to a treatment facility. *Id.* Discharge from a treatment facility may be initiated in two ways. First, the facility's director can certify to a district court that the individual no longer poses a threat or will not pose a threat "to others if released under a prescribed regimen of medical, psychiatric, or psychological care or treatment." *Id.* §§ 4248(d)(2), (e). Second, counsel for the individual or his legal guardian may petition for discharge. *Id.* § 4247(h).

Upon receipt of the facility director's certification or the individual's motion, the district court may either order the individual discharged or hold a hearing to determine whether the individual should be released. *Id.* § 4248(e). If the district court finds that the

4

individual would no longer pose a threat to others if released, it must order the individual discharged from civil commitment. *Id.*; *see United States v. Vandivere*, 88 F.4th 481, 493 (4th Cir. 2023) (holding that "the detainee bears the burden of proof" in a discharge hearing under the Adam Walsh Act). Discharge may be unconditional, 18 U.S.C. § 4248(e)(1), or conditioned on compliance with a "prescribed regimen of medical, psychiatric, or psychological care or treatment," *id.* § 4248(e)(2). District courts have discretion to establish conditions that minimize the risk of future harm while supporting recovery.

Conditional discharge may be revoked if a court determines that the individual failed to comply with his prescribed regimen of care or treatment and, in light of this failure, would be "sexually dangerous to others." *Id.* § 4248(f). Thus, an individual's conditional discharge will only be revoked if the government can show that the individual: 1) failed to comply with his prescribed regimen of care or treatment, *id.*; 2) suffers "from a serious mental illness, abnormality, or disorder," *id.* § 4247(a)(6); and 3) in light of his failure to comply and as a result of his mental illness, would have "serious difficulty in refraining from sexually violent conduct or child molestation" were he to remain in the community, *id.*; *see id.* § 4248(f). As we will explain, the government bears the burden to prove each element by a preponderance of the evidence.

Before addressing the specifics of this case, we take a moment to acknowledge the gravity of a ruling that revokes an individual's conditional discharge. While "a commitment errantly discontinued poses a danger" to the public, one that is "wrongly perpetuated is an unwarranted restraint of liberty." *United States v. Perkins*, 67 F.4th 583, 585 (4th Cir. 2023). When conditional discharge is revoked, an individual is ordered out

of his community and returned to civil commitment. Failure to comply with a prescribed treatment regimen will not, without more, suffice to support revocation of release. 18 U.S.C. § 4248(f). Revocation is appropriate only upon a determination by a district court that an individual can no longer safely remain in the community, even under strict conditions of release.

With these principles in mind, we proceed to the facts of this case.

### B.    Factual Background

Robert Boyd has admitted to sexually abusing at least fourteen children over decades, beginning in the 1970s. He has been convicted of committing numerous sexual offenses involving minors, including his most recent conviction in 2001 for downloading child sexual abuse material (CSAM) in violation of 18 U.S.C. §§ 2252(a)(2), (b)(1). Following this conviction, Boyd was incarcerated at FCI Butner, a federal prison in North Carolina.

As Boyd was nearing the end of his prison term in 2008, the Attorney General initiated civil commitment proceedings in federal district court under the Adam Walsh Act. *See id.* § 4248(a). Pending an evidentiary hearing on whether he should be deemed a "sexually dangerous person," Boyd remained in custody pursuant to Section 4248(a), which calls for the detention of individuals already in custody pending a hearing. *Id.* In 2012, a federal district court held the hearing and found, by clear and convincing evidence, that Boyd: had engaged in or attempted to engage in sexually violent conduct or child molestation; suffered from a serious mental illness, abnormality, or disorder; and, as a

6

result of that illness, would have serious difficulty refraining from sexually violent conduct or child molestation should he be released. Following this ruling, the district court designated Boyd a "sexually dangerous person" and ordered him civilly committed to the custody of the Attorney General. A panel of this court affirmed. *United States v. Boyd*, 537 F. App'x 234 (4th Cir. Aug. 7, 2013).

Boyd remained committed at FCI Butner until 2020, when the Government initiated proceedings for his release pursuant to 18 U.S.C. § 4248(e)(2). The Government filed a certification, issued by the FCI Butner warden, stating that Boyd's condition had improved significantly and that Boyd would no longer pose a danger to the community if he were released under a prescribed regimen of medical, psychiatric, or psychological care or treatment. On the basis of the warden's certification, the Government sought Boyd's conditional release. Boyd joined the Government's motion.

The district court reviewed the warden's request and, in 2021, ordered Boyd released under the supervision of the United States Probation Office. Boyd's release was conditioned on his compliance with a prescribed regimen of treatment including thirty-eight requirements. Among these requirements, Boyd was not permitted to own or operate any unapproved electronic devices, was required to avoid direct contact with minors without written approval, and was required to report any such contact to his supervising probation officer within twenty-four hours. Most relevant to this appeal is Condition 37, which required Boyd to refrain from "[p]ossess[ing] any adult or child pornography or visual depictions of adult or child erotica or nude minors, or any materials . . . depicting and/or describing sexually explicit conduct[.]" Parties' Joint Appendix (J.A.) 98–99.

7

During the first year following his release, Boyd complied with his treatment regimen and, by all accounts, was making progress. Though initially he lived in a halfway house, Boyd eventually transitioned into more permanent housing in an apartment complex in which a number of individuals registered as sex offenders resided. While the complex was equipped with WiFi, Boyd's access to the internet was restricted under the conditions of his release and supervised by the probation office. Boyd was permitted to access the internet only through a computer that had been equipped by the probation office with a monitoring platform. This platform tracked any attempt to access impermissible materials online.

After a time, Boyd's probation officer discovered that Boyd possessed unapproved devices that were capable of accessing the internet in violation of his conditions of release. Boyd's probation officer learned that Boyd had accessed unauthorized media, subscribed to unauthorized streaming services, and played multiplayer videogames through which he could have communicated with strangers, including minors, online. The probation officer also discovered that Boyd purchased a "Smart" television which he used to view YouTube videos, including art depicting nudity. On another occasion, Boyd's probation officer discovered that Boyd purchased a tablet with internet capabilities, though the box remained unopened.

Approximately one year after his conditional discharge, Boyd reported to the probation office that a pop-up window had suddenly appeared on his computer screen notifying him that he had been locked out of the computer. Boyd suspected that his computer had been hacked because someone on the apartment complex's shared WiFi

8

network had accessed CSAM. Boyd insisted that he had not done so. The pop-up alert directed Boyd to call a service number to resolve the issue. Boyd told his probation officer that he promptly called the number and gave a third party access to his computer remotely.

Following Boyd's call with his probation officer, the probation officer came to Boyd's apartment to search his computer. The probation officer was unable to observe any evidence of the alert Boyd had described and asked Boyd whether he could take the computer, as well as an SD card[2] he found in Boyd's apartment, for forensic examination. Boyd permitted the officer to do so.

About two months after the incident with the computer, Boyd's probation officer asked Boyd whether he had experienced anything while living in the community that he felt could tempt or push him to reoffend. In response, Boyd reported that, several weeks earlier, he had interacted with a minor who worked at a local Burger King where Boyd frequently purchased food on his way home from meeting with his treatment provider. Boyd reported that he had found himself attracted to the underage Burger King employee and had contemplated asking him for his telephone number. Boyd's probation officer instructed Boyd to avoid interacting with the employee and suggested that Boyd discuss this attraction with his treatment provider. Over the next few months, Boyd reported that he had returned to the Burger King and had two more interactions with underage

---

[2] An SD card, or Secure Digital card, is a removable memory chip used to save photos, videos, and files for use in computers and videogame systems, among other uses. Boyd's probation officer had not authorized Boyd to possess an SD card.

9

employees. Finally, the probation officer advised Boyd to stay away from the Burger King altogether.

A short time later, Boyd's probation officer received the forensic examination report, which confirmed Boyd's suspicion that his computer had been hacked. Although no pornographic material was found on Boyd's computer, forensic examination of the SD card revealed that the card contained approximately ninety images depicting men who appeared to be underage. The forensic report described some of the images as "pornographic in nature," *id.* at 108, and described many of the images as containing a watermark with the name of a pornographic website that Boyd had previously been known to visit. Along with the report from the forensic examination, Boyd's probation officer received and reviewed a copy of the SD card.

Several days after receiving the forensic examination report, Boyd's probation officer reported that Boyd had violated a condition of his release and requested that he be taken into custody.

## II.     Procedural History

The Government moved to revoke Boyd's conditional discharge on the ground that Boyd had failed to comply with his prescribed regimen of treatment by violating a condition of release. Specifically, the Government contended that Boyd violated the prohibition on possessing and viewing pornography—Condition 37—by possessing an SD card with pornographic images. The Government urged the court to find that Boyd presented a risk of reoffending, that the conditions of release previously imposed were

insufficient to mitigate that risk, and that Boyd should no longer be permitted to remain in the community. The Government also sought a warrant for Boyd's arrest.

The district court found probable cause to believe that Boyd had failed to comply with his prescribed regimen of treatment. The district court ordered Boyd taken into custody pending a hearing to determine whether to revoke his conditional release from civil commitment. Boyd was detained and returned to FCI Butner. Boyd refused to participate in treatment programs at FCI Butner while detained pending the hearing.

At the revocation hearing, Boyd's probation officer testified about what he had seen on the copy of the SD card. He described images of young males "designed to look like teenage boys." J.A. 226. The probation officer also testified that he was concerned about Boyd's recent behavior, in particular his interactions with the underage Burger King employees. The probation officer testified that Boyd had played online videogames, and purchased unauthorized electronic devices and streaming subscriptions, all in violation of the conditions of his release. According to the probation officer, this behavior made him increasingly concerned that Boyd once again posed a danger to the community and that the conditions of release were inadequate to prevent him from reoffending.

The Government also presented video deposition testimony of Dr. Erik Fox, a forensic and clinical psychologist who had evaluated Boyd. Dr. Fox had also reviewed the forensic report and the images on the copy of the SD card. Dr. Fox offered his expert opinion that Boyd's conditional release should be revoked. Dr. Fox diagnosed Boyd with

11

a paraphilic disorder[3] and testified that, in his expert opinion, Boyd would have serious difficulty refraining from reoffending. Dr. Fox employed actuarial risk assessment instruments to analyze the statistical likelihood of Boyd reoffending. One assessment calculated the likelihood as being in the 88th percentile, which meant that Boyd's expected recidivism rate was more than double that of a typical sex offender.

In Dr. Fox's view, Boyd had "failed treatment," *id.* at 320, as demonstrated by the fact that he possessed pornographic images depicting young males who appeared to be "pubescent," even if they were not in fact minors, *id.* at 308. Dr. Fox expressed particular concern about several of Boyd's behaviors, including his possession of images of men that largely matched the description of his past victims, his use of the internet to provide "visual stimuli of his deviant sexual interest," *id.* at 350, and his repeated and planned interactions with underage Burger King employees to whom he had admitted an attraction.

Dr. Fox questioned Boyd's willingness to tell the truth about his actions unless he was confronted directly and noted that Boyd had downplayed his concerning behaviors. Dr. Fox stated that Boyd's deceptiveness factored into the risk assessment because Boyd may have deceived minor victims in the past. Dr. Fox described Boyd as a "very highly repetitive offender" who, as "both a child pornography offender and a contact offender," was at a higher risk of reoffending than other prior offenders who had only committed one

---

[3] Dr. Fox described a "paraphilic disorder" as an interest in, or history of, acting on sexual behavior that does not conform to societal norms, including behavior directed at minors. Specifically, Dr. Fox described Boyd as being sexually interested in pubescent-aged males.

12

of the two offenses. *Id.* at 347–48. Thus, in Dr. Fox's expert opinion there were no conditions of release that would be sufficient to mitigate the risk Boyd posed to the community, particularly in light of Boyd's refusal to participate in treatment at FCI Butner at the time Dr. Fox evaluated him.

Boyd testified on his own behalf. He insisted that he never viewed any of the images on the SD card. He told the court that he received the SD card from another individual in his apartment complex, though he could not recall the individual's name. Although he did not deny the behaviors about which his probation officer and Dr. Fox expressed concern, Boyd downplayed their significance. For example, while Boyd admitted that he subscribed to unapproved streaming services, he claimed only to have watched "wholesome movies" that were not "tempting or a trigger." *Id.* at 201. When asked whether he viewed nude art, Boyd responded that he "was looking at artwork throughout the Louvre, yes." *Id.* at 175. Boyd also testified that he was not "sexually attracted" to the underage Burger King employees, although he admitted that he thought one "was a handsome young man for a split second." *Id.* at 183.

In support of permitting him to remain in the community, Boyd also presented the expert testimony of Dr. Joseph Plaud, a clinical and forensic psychologist who had evaluated him. Dr. Plaud offered his expert opinion that Boyd did not pose a threat to others under the conditions of his release. According to Dr. Plaud, even assuming Boyd knowingly possessed the images on the SD card—which Boyd insisted he had not—this violation of a single condition of release did not show Boyd could no longer safely remain in the community. Dr. Plaud testified that Boyd had demonstrated "over a period of time

in the community, both before and after the [SD card] event, control over his sexual impulses and behavior." *Id.* at 256.

Though Dr. Plaud acknowledged that some of Boyd's behaviors had been problematic, he nevertheless concluded that Boyd's consistent communication with his treatment provider and his probation officer, in addition to his regular participation in treatment programs, demonstrated that Boyd did not pose a threat to the community.

Unlike Dr. Fox, Dr. Plaud had not conducted an actuarial risk assessment to estimate the statistical likelihood of Boyd's risk of reoffending. Rather, he relied solely on his expertise, professional literature concerning relevant risk factors, and his evaluation of Boyd.

The district court evaluated the evidence and concluded that the Government had met its burden to prove by a preponderance of the evidence that Boyd did not fully comply with his prescribed regimen of treatment and, in light of this failure, should once again be deemed "sexually dangerous to others," within the meaning of the Adam Walsh Act. The district court first found that Boyd failed to comply with his prescribed regimen of treatment by possessing the pornographic images, in violation of Condition 37 of his release. The district court found Boyd not credible. The district court pointed to discrepancies in Boyd's testimony, his efforts to downplay the significance of his prior offenses and behaviors, and his general lack of candor throughout the proceedings.

On the issue of sexual dangerousness, the district court credited the Government's expert, Dr. Fox, over Boyd's expert, Dr. Plaud. The district court considered evidence of Boyd's continued sexual attraction to minors after years of treatment, possession of

14

pornography, limited progress in treatment, deception, and risk-related behavior that escalated while in the community. Based on this evidence, the district court concluded that Boyd was "sexually dangerous to others" and could no longer safely remain in the community, even under strict conditions of release. The district court found that Boyd's risk of reoffending could be mitigated only by in-custody treatment. The district court thus revoked Boyd's conditional discharge and ordered him remanded to the custody of the Attorney General. The Attorney General directed that Boyd be civilly committed to FCI Butner, where he remains.

Boyd timely appealed the revocation of his release. This court has jurisdiction over the district court's final order revoking Boyd's conditional discharge pursuant to 28 U.S.C. § 1291.

## III.    Standard of Review

This is the first time this court has been called upon in a published opinion to review a district court's decision to revoke conditional discharge from civil commitment under the Adam Walsh Act. We hold that such decisions should be reviewed with deference to the district court's determinations of fact. We thus review the district court's factual findings for clear error and its legal conclusions *de novo*. *See Perkins*, 67 F.4th at 589–90 (reviewing revocation of conditional release under related statute using this standard). We will reverse a district court's factual finding as clearly erroneous only if we are "left with the definite and firm conviction that a mistake has been committed." *United States v. Caporale*, 701

F.3d 128, 135 (4th Cir. 2012) (quoting *United States v. Wooden*, 693 F.3d 440, 451 (4th Cir. 2012)).

## IV.    Analysis

Though the Adam Walsh Act provides for the possibility that an individual's conditional discharge may be revoked, the Act does not specify the standard of proof the Government must meet in seeking such revocation. *See* 18 U.S.C. § 4248(f). Nor has this court previously pronounced what that standard should be. The district court applied the preponderance of the evidence standard, citing this court's decision in *United States v. Perkins*, 67 F.4th 583, 615 (4th Cir. 2023), and the parties do not dispute that this was correct. In *Perkins*, this court considered the standard applicable to the revocation of conditional discharge of an individual who had been determined to pose a substantial risk of bodily injury to another person or serious damage to the property of another as a result of his mental disease or defect under 18 U.S.C. § 4246(f). 67 F.4th at 591–92, 615. There, this court concluded that the preponderance of the evidence standard applies. *Id.* at 615. Because similar considerations inform the revocation of conditional discharge under the Adam Walsh Act, we conclude that the preponderance of the evidence standard should also apply in revocation proceedings under 18 U.S.C. § 4248(f).

Applying this standard, conditional discharge from civil commitment under the Adam Walsh Act may be revoked only if the Government proves by a preponderance of the evidence that the requirements for revocation have been met. The Act permits revocation of conditional release only if: 1) the individual failed to comply with his

16

prescribed regimen of care or treatment (the failure to comply element), 18 U.S.C. § 4248(f); 2) the individual suffers "from a serious mental illness, abnormality, or disorder" (the mental illness element), *id.* § 4247(a)(6); and 3) in light of his failure to comply and as a result of his illness, the individual would have "serious difficulty in refraining from sexually violent conduct or child molestation" if the individual were permitted to remain in the community (the future risk of harm element), *id.*; *see id.* § 4248(f).[4]

Though Boyd does not contest that he suffers from a serious mental disorder (the mental illness element), he contends that the district court erred in finding that he failed to comply with his prescribed treatment regimen by knowingly possessing pornography in violation of Condition 37 of his release (the failure to comply element) and that he would be sexually dangerous to others in light of this violation if permitted to live in the community (the future risk of harm element). We address each revocation element in turn and affirm the ruling of the district court.

---

[4] As we explained above, the second and third elements of this test are derived from the definition of the phrase "sexually dangerous to others" set forth in 18 U.S.C. § 4247(a)(6). This definition is relevant because an individual's conditional discharge may only be revoked if the individual fails to comply with his prescribed regimen of treatment and, in light of this failure, would be sexually dangerous to others if permitted to continue receiving treatment in the community. 18 U.S.C. § 4248(f). Notably, a court must also find an individual "sexually dangerous to others" before ordering civil commitment under 18 U.S.C. § 4248(a). *See Francis*, 686 F.3d at 274 (discussing requirement that a district court conclude that an individual is "sexually dangerous to others" as a condition of ordering civil commitment).

17

A.  Failure to Comply with Prescribed Regimen of Treatment

We first address Boyd's contention that the district court clearly erred in concluding that the Government met its burden on the failure to comply element. The district court found that Boyd knowingly possessed pornography, in violation of the thirty-seventh condition of his release. The district court did not credit Boyd's testimony that he had unwittingly received the SD card from a neighbor and that he had never viewed the images on the card. Instead, the district court credited the testimony of Boyd's probation officer and Dr. Fox. Boyd calls into question the district court's credibility determinations and contends that the district court committed clear error by failing to take into consideration that Boyd immediately called his probation officer after suspecting that his computer had been hacked. We discern no such error.

"The clear error standard preserves the district court's role as the primary fact finder," and we may not "reverse factual findings" even if we may "have weighed the evidence differently." *Vandivere*, 88 F.4th at 493–94. As to the district court's conclusion that Boyd lacked credibility, we afford "great deference to the district court's credibility findings" and it "is not our role to second guess" them. *United States v. Ellis*, 130 F.4th 442, 449 (4th Cir. 2025). Boyd's probation officer and Dr. Fox presented "coherent and facially plausible" accounts "not contradicted by extrinsic evidence" and "not internally inconsistent." *United States v. Lynn*, 912 F.3d 212, 216 (4th Cir. 2019) (quoting *United States v. Hall*, 664 F.3d 456, 462 (4th Cir. 2012)). Having reviewed the record and the district court's reasoning, we defer to the district court's credibility assessments.

18

Nor can we say the district court "overlooked evidence." *United States v. Charboneau*, 914 F.3d 906, 916 (4th Cir. 2019). The district evaluated the evidence presented and credited the testimony of Boyd's probation officer and Dr. Fox. Boyd has not identified evidence that, if considered, would have changed the district court's conclusion. Rather, he points to evidence that the district court acknowledged yet was not swayed by.[5] We decline Boyd's request to reweigh the evidence. *See Vandivere*, 88 F.4th at 494.

Because we "have not been left with 'the definite and firm conviction' that the district court erred in concluding" that Boyd failed to comply with his prescribed regimen of treatment, *id.* (quoting *Easley v. Cromartie*, 532 U.S. 234, 242 (2001)), we affirm the district court's ruling that the Government met its burden on the first element.

### B.  Sexually Dangerous to Others

We now address Boyd's assertion that the Government did not meet its burden to show by a preponderance of the evidence that Boyd should be deemed sexually dangerous to others given his failure to comply with his prescribed regimen of treatment.

---

[5] Boyd rests much of his argument on a polygraph test he passed after he turned his computer and SD card over to his probation officer. Boyd was asked whether he knew that the computer and SD card contained pornography. He responded that he had been unaware of this fact, and the polygraph found the response to be truthful. Boyd argues the polygraph test proves that he did not knowingly possess pornography. The district court credited testimony from Boyd's probation officer and Dr. Fox that polygraph tests can be manipulated and are not necessarily indicative of truthfulness. We defer to that finding.

19

In the context of a revocation proceeding, an individual is deemed sexually dangerous to others and his conditional release may be revoked only if, as a result of a "serious mental illness, abnormality, or disorder," 18 U.S.C. § 4247(a)(6), and "in light of his failure to comply with [his] prescribed regimen of . . . treatment," *id.* § 4248(f), the individual "would have serious difficulty in refraining from sexually violent conduct or child molestation" were he to remain in the community, *id.* § 4247(a)(6); *see id.* § 4248(f).

The parties do not dispute that Boyd suffers from a serious mental disorder. And, as we have explained, the district court did not err in concluding that Boyd failed to comply with his prescribed regimen of treatment. Boyd contends that the district court erred in finding that the Government met its burden to show, as a result of his mental disorder and in light of this failure, he posed a risk of future harm. We disagree.

The district court provided "a thorough and well-supported explanation" of "a reasoned and logical linkage between [Boyd's] failure to comply with" his prescribed regimen of treatment and the threat he posed to others in light of this failure. *Perkins*, 67 F.4th at 634. In concluding that the Government met its burden, the district court found significant that possessing pornographic images was known to be a "relapse trigger." J.A. 448. The district court also agreed with the Government that Boyd had "engaged in a pattern of deceptive and escalating risk-relevant behavior[s]" while in the community. *Id.* at 442. The district court expressed particular concern that the young males depicted in the images on the SD card appeared to match the description of Boyd's past victims and that the images were from a website that Boyd had been known to frequent. It noted that Boyd failed to report his interactions with the underage Burger King employees within twenty-

20

four hours, as required by the conditions of his release. The district court additionally expressed concern that Boyd had accessed unauthorized media and purchased unapproved devices.

In reaching its conclusion that Boyd posed a risk of future harm, the district court credited the Government's expert, Dr. Fox, over Boyd's expert, Dr. Plaud. The district court found particularly significant that Dr. Fox relied on actuarial risk assessment instruments to predict the likelihood of Boyd reoffending, whereas Dr. Plaud did not. The district court is best positioned to "[e]valuat[e] the credibility of experts and the value of their opinions[.]" *United States v. Bell*, 884 F.3d 500, 508 (4th Cir. 2018) (quoting *United States v. Heyer*, 740 F.3d 284, 292 (4th Cir. 2014)). We are "especially reluctant to set aside a finding based on the trial court's evaluation of conflicting expert testimony," and we decline to do so here. *Id.* at 507–08 (quoting *Hall*, 664 F.3d at 462).

The sexual dangerousness inquiry is complex and hinges on predictions. *See Wooden*, 693 F.3d at 460 (discussing requirement that an individual be "sexually dangerous to others" in the context of initial commitment under the Adam Walsh Act). A district court must endeavor to predict whether an individual poses a future threat to others based on evidence of past events and expert evaluations. The district court did just that. The district court's "factual findings represent a permissible and reasonable interpretation of the evidence presented at the hearing." *United States v. Bolander*, 722 F.3d 199, 216 (4th Cir. 2013).

The district court did not clearly err in concluding that the Government met its burden to show by a preponderance of the evidence that Boyd posed a future risk of harm

21

in light of his mental disorder and his failure to comply with his prescribed treatment regimen.

To summarize, we hold that the district court did not err in finding that the Government demonstrated by a preponderance of the evidence that all of the elements required for revocation of conditional release under 18 U.S.C. § 4248(f) were met. There is sufficient evidence in the record to support the district court's conclusion that Boyd failed to comply with his prescribed regimen of treatment. There is no disagreement that Boyd continues to suffer from a serious mental disorder. The district court also did not err in concluding that, in light of Boyd's mental disorder and his failure to comply, he would have serious difficulty refraining from sexually violent conduct or child molestation if permitted to continue treatment in the community.

## V.      Conclusion

For the reasons set forth above, we affirm the determination of the district court that Boyd's conditional discharge should be revoked.

*AFFIRMED*